OPINION OF THE COURT
Shanley N. Egeth, J.
These two separate proceedings involving essentially the same facts and prayer for relief (Nos. 120 and 196 of February 23, 1979) are consolidated for single disposition.
These proceedings were commenced by the petitioners to procure an order and judgment pursuant to CPLR article 78 annulling the determination of the Superintendent of Banks of the State of New York (Siebert) which rendered the petitioners ineligible to present themselves as candidates in the imminently scheduled election of the Municipal Credit Union of the City of New York (MCU), and further to direct and compel acceptance of their nominating petitions for filing, to place their names on the ballot as eligible candidates, to reschedule the election at a later date, and for other incidental relief.
FACTUAL BACKGROUND
Petitioners are all members of the MCU. The petitioners in the Garfield proceeding are former directors of MCU; those in the Bright proceeding are former members of its credit committee. Membership in both groups are expected to be elected at the scheduled election.
MCU is a Federally insured credit union chartered in 1916 pursuant to the laws of the State of New York. It receives deposits from eligible members, retains and holds their savings, issues shares to them and makes loans from these funds to its members. In October, 1977, MCU had approximately 113,900 members. It was then the largest State chartered credit union in the State of New York in size of membership, and the second largest in assets (assets of about $135,000,000).
MCU, and all credit unions are subject to regulation and supervision by the State Banking Department. The State Banking Department determined that as of April, 1977 the ratio of delinquent loans to total loans had increased from 3.96% to 5.8% in the preceding year; the book net worth against percentage of shares had declined from 6.5% to 4.8%; and net earnings were insufficient to maintain MCU’s dividend rate and to make required statutory transfers to surplus *568 and bad debt reserves without invading its surplus. Siebert asserted that a bitter internecine battle for control was being waged by two competing factions while the MCU’s financial condition was steadily deteriorating. On October 31, 1977, following the publication of an unfavorable newspaper article concerning MCU, there was an increased clamor for withdrawal of funds which created the equivalent of a run on the bank. The average daily withdrawals increased from a prior norm of about $261,000 per day to about $1.5 million on October 31, 1977, $1.6 million on November 1, 1977 and $1.5 million on November 2, 1977.
The internecine conflict had resulted in legal proceedings following the elections in 1974, 1975, 1976 and 1977, and the invalidation of the claimed election in 1977. The Internal Revenue Service indicated in 1977 that excessive legal expenses might jeopardize continuation of MCU’s tax-exempt status. In 1977 the Banking Department began monitoring MCU’s operations and attending some meetings of the board of directors.
On November 2, 1977 the Superintendent of Banks took possession of MCU, pursuant to section 606 of the Banking Law in order to preserve its assets, protect the rights of its depositor-shareholders and other creditors, and to rehabilitate the MCU and return it to its shareholders as soon as possible thereafter. In so doing, Siebert suspended the operation and authority of the board of directors, supervising committee and the credit committee of MCU. All members of these committees ceased to function, and the general manager was dismissed. The Department of Banking took over control of the operations of MCU.
On July 25, 1978, the Banking Board of the New York State Banking Department adopted special regulations establishing procedures for general and special meetings of members, and for the election of members of the board of directors and other statutory committees of MCU. Included therein were provisions governing eligibility requirements for members seeking election to these MCU committees.
On or about October 31, 1978, Siebert announced that elections would be held on March 2, 1979 to elect members of the MCU board of directors, and of its credit committee and supervisory committee. A nominating committee was appointed, and résumés of putative nominees were to be sent to it. The news release containing the Siebert election announce *569 ment indicated that in accordance with applicable regulations eligibility for election to these committees was available to members of MCU for at least 30 days prior to the date set for the election meeting. To procure a place on the ballot a candidate was required to circulate and file (by January 22, 1979) designating petitions containing the signatures of 2% of the membership of MCU, i.e., 2,337 members.
Pursuant to this announcement, petitioners submitted their résumés, procured copies of the nominating committee’s rules and the form designating petitions. Between December 15, 1978 and January 22, 1979, all of the petitioners solicited members of MCU and procured signatures on their designating petitions. Petitioners Garfield and Mason engaged in a joint solicitation of petition signatures with James McKeon and Dorothy Brown, and they filed petitions containing over 4,000 signatures for each; petitions containing 2,400 signatures were filed for petitioner Bright and 2,473 signatures for petitioner Rock. They all met the membership eligibility standard.
On January 17, 1979, after it became clear to Siebert that "one or more of the former MCU Directors and Committee members would seek to regain their positions by petitioning to have their name [sic] placed on the ballot at the March 2, 1979 election”, she issued an order which is the subject of these proceedings. That order provided that "no person who on November 2, 1977, was an incumbent member of the Board of Directors, the Credit Committee or the Supervisory Committee shall have his or her name placed on the ballot election to any office of MCU in the 1979 election * * * [or to] take office as an elected official of MCU as a result of the 1979 election.”
On the basis thereof, the petitioners were barred from participation in the election as candidates. McKeon and Brown, whose candidacies were initiated on the basis of the same designating petitions as those filed for the Garfield and Rock candidacies, were qualified to participate as candidates. It is important to note that at no time prior to this date have any of the petitioners been specifically charged with acts of misconduct pursuant to section 660 et seq. of the Banking Law, or violation of an oath of office pursuant to section 466 of the Banking Law. No formal charges have ever been lodged against them accusing them of malfeasance, negligent or other failure of performance of duty, or in any manner having *570 otherwise caused or otherwise acted so as to specifically create the MCU difficulties resulting in its takeover by the State Banking Department. There has never been a judicial or administrative hearing at which any petitioner was required to account for his stewardship or performance in office, nor has there ever been a judicial or administrative finding of dereliction by any of them.
THE ISSUE
The issue raised in these proceedings is whether under the existing circumstances, the Superintendent of Banks improperly barred petitioners from participation as candidates in the MCU election.
RESOLUTION
This court holds that these petitioners were improperly barred from presenting their candidacies in the MCU election by the Banking Superintendent.
LAW
Our courts have long held that the right of a stockholder to a voice in the management of a corporation is a property right and vested interest entitled to protection under the Constitution (Page v American & British Mfg. Co., 129 App Div 346). These petitioners who are shareholders of MCU, and have held office therein, and developed a reputation in connection therewith, are constitutionally protected with the requirements of due process before any governmental action may be undertaken to cause an abridgment or deprivation of their right to seek continuation. Our Court of Appeals has determined that any person whose property rights are adversely to be affected by governmental action is entitled to the elementary due process, right of notice of such pending action and any charges to be leveled, and a hearing affording an opportunity to confront and refute such charges. This right has been implied by law, irrespective of whether a particular statute, or regulation so provides. (Matter of Hecht v Monaghan, 307 NY 461, 468; Bernard-Charles, Inc. v Cuomo, 58 AD2d 535.) This constitutional right to confrontation and due process has consistently been articulated by the United States Supreme Court and our State courts (Joint Anti-Fascist Refugee Committee v McGrath, 341 US 123, 137, 138; Board of Regents v *571 Roth, 408 US 564; Matter of Chant v Department of State of State of N. Y., 60 AD2d 535, 536; Matter of Roy Anthony A., 59 AD2d 662).
As has been indicated, no formal charges of any kind have been made against these petitioners by Siebert, nor has the Banking Department come forth with any other evidence of any judicial or administrative determination or charge which might justify their disqualification from participation in this election as candidates. No specific allegations of misconduct or even negligent conduct have been made as to their performance in office. Implicit in the Siebert order barring participation as candidates in the election is an inference that a finding of impropriety or incompetence had been made, and that the order is in the nature of a penalty meted out as a result thereof. This is akin to the superintendent in effect rendering a sentence against these petitioners without a prior accusation or trial.
The action of Siebert in this case runs afoul of another cardinal precept of constitutional due process and plain elementary fairness. In originally scheduling the election, membership was articulated as the sole eligibility requirement for filing a candidacy. Subsequent thereto, after the petitioners complied with the announced rules and requirements, the superintendent issued the order barring their right to run for office or hold office. This actually effectuated a change in the rules of eligibility after the original rules were promulgated, and after these petitioners and all candidates relied and acted thereon. This order of Siebert is governmental action similar or akin to a regulation or a statute. This second order is in the nature of an ex post facto law which is constitutionally abhorrent. The change effected by this second order, as soon as it became apparent that petitioners were complying with and relying upon the first order, is constitutionally proscribed ex post facto legislation (Greene v United States, 376 US 149).
HOLDING
Upon the basis of the foregoing this court must invalidate the action of Siebert and the other respondents, in barring petitioners from participation as candidates in the election, or holding office, if successful. The order necessarily compels a constitutional deprivation of due process. Additionally, the action of Siebert under these circumstances is arbitrary and *572 capricious, and not a proper exercise of discretion. The order is therefore invalidated.
EXCLUSIONS FROM HOLDING
This holding in no way is intended to derogate the general power of Siebert in the performance of the duties of her office, to place MCU or any other regulated entity into the equivalent of a receivership, liquidation or rehabilitation relationship, or to suspend or terminate officers or employees in connection therewith. That right has been statutorily and judicially validated (Banking Law, §§ 606, 41; Lafayette Trust Co. v Beggs, 213 NY 280; Peterson v State of New York, 67 AD2d 1054).
In addition, this court also is not seeking to bar the Superintendent of Banks from preventing the candidacy of inappropriate persons after a proper determination of ineligibility has been made, and constitutional requirements of due process have been satisfied. (Notice, hearing, confrontation and right of cross-examination.) Under appropriate procedures Siebert may quite possibly constituionally bar these petitioners from being candidates, or from holding office.
NECESSARY IMMEDIATE RELIEF
The invalidation on the eve of the election of the order barring petitioners’ right to participate therein as candidates, does not afford them a reasonable opportunity to present and submit their candidacies. To hold an election tomorrow, March 2 at 10:00 a.m., under existing circumstances would render a mockery of the electoral process. The scheduled election is therefore enjoined. It may not be rescheduled until proper due notice is given and until all candidates are afforded equal and fair opportunity to campaign. Full compliance must be had anew with all provisions contained in 3 NYCRR 209.3.
Petitioners’ candidacies may not be prohibited in any new election until the necessary due process requisites have been complied with.
IMPLEMENTATION
The parties are directed to settle a judgment in conformity with this decision. It recognized that this may not be physically feasible prior to the projected 10:00 a.m. March 2, 1979 *573 election. Therefore this decision is to be deemed, and constitutes an order of this court, and it is afforded the status of a preliminary injunction. Such status shall continue until entry of judgment as provided for herein.